**JONES & LAUGHLIN STEEL CORPORATION**
and
**Insurance Company of North America, Appellants,**
v.
**Eustace J. MATHERNE et al., Appellees.**
**No. 21105.**

United States Court of Appeals
Fifth Circuit.
June 25, 1965.

Carl J. Schumacher, Jr., Lemle & Kelleher, Dermot S. McGlinchey, David L. Campbell, New Orleans, La., for appellants.

Jack W. Thompson, Jr., Jacob J. Meyer, New Orleans, La., Ted J. Borowski, Houma, La., Gerard M. Dillon, John V. Baus, Francis J. Mooney, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for appellees, Clark Equipment Co. and Liberty Mut. Ins. Co.

Before RIVES, Circuit Judge, and CHRISTENBERRY and MORGAN, District Judges.

RIVES, Circuit Judge.

Eustace J. Matherne was a carpenter-foreman employed in the building of a high school at Houma, Louisiana. On September 7, 1960, he was struck on the head by a falling boom of a Michigan T-20 crane and was horribly injured. This action was originally filed in June 1961 to recover damages for his personal injuries, but death from the injuries and ensuing complications intervened in March 1963. His widow and nine children were substituted as parties plaintiff.

The falling boom had been released by the fracture or cracking of a "Jal Klamp" fitting on one of its pendant lines supporting the boom. The action was brought against Jones & Laughlin Steel Corporation, the manufacturer of the Jal Klamp, and against Clark Equipment Company [1] from whom Matherne's employer had purchased the pendant line and affixed Jal Klamp in May 1959.

At the end of a three-day trial, which impresses us as a model of skill and ability on the part of the district judge and of all the trial counsel, the jury returned a special verdict as follows:

"SPECIAL VERDICT

"WE, THE JURY FIND:

"1. Was Jones & Laughlin Steel Corporation negligent? Yes

"2. If your answer to No. 1 is in the affirmative, was its negligence a proximate cause of the accident? Yes

"3. Was Clark Equipment Company negligent? No

"4. If your answer to No. 3 is in the affirmative, was its negligence a proximate cause of the accident? No

"5. Was Eustace Matherne negligent? Yes

"6. If your answer to No. 5 is in the affirmative, was his negligence a proximate cause of the accident? No

"7. What was the total amount of damages suffered by Eustace Matherne prior to his death as a result of this accident? $68,000

"8. What is the total amount of damages suffered by Mrs. Eustace Matherne as a result of the death of Eustace Matherne? $40,000

"9. What is the total amount of damages suffered by each of the following surviving children as a result of the death of Eustace Matherne:

Larry Matherne— Born October 11, 1939 $ 5,000.00

Glenn Matherne— Born September 13, 1962 $ 5,000.00

Lynda Matherne— Born September 20, 1945 $ 7,550.00

Diana Matherne— Born September 21, 1947 $ 9,250.00

Lance Matherne— Born August 21, 1951 $12,650.00

Winona Matherne— Born May 14, 1963 $14,350.00

Vaughn Matherne— Born July 4, 1954 $15,200.00

Mark Matherne— Born February 4, 1959 $19,450.00

Debora Matherne— Born February 4, 1959 $19,450.00

"Dated July 11, 1963

(signed) Morgan C. O'Rourke, Jr."

The judgment entered on the verdict was for damages totaling $215,900, but there is no suggestion that the amount was excessive. There being no complaint as to the judgment in favor of the defendant Clark Equipment Company and its insurer, the appeal as to them has been dismissed. Jones & Laughlin and

1. The liability insurers of both companies were also made parties defendant, as is permitted in Louisiana.

its insurer contend that there is no sufficient evidence to support the jury's findings that Jones & Laughlin was negligent and that its negligence was the proximate cause of the accident. In the alternative, they insist that the district court committed reversible errors in the admission of evidence and in its charge to the jury.

### 1. Jones & Laughlin's Negligence.

The evidence was without dispute that the Jal Klamp was manufactured by Jones & Laughlin, that the fracture or cracking of the Jal Klamp allowed the boom to fall, that the boom struck Matherne, and that the resultant injuries ultimately caused his death. The only matters in dispute were whether the breaking of the Jal Klamp was the result of negligence in its manufacture, and whether Matherne was guilty of contributory negligence which proximately caused the accident.

The Jal Klamp is a mechanical splice made of aluminum alloy, cold-pressed upon wire rope to hold a loop in the rope. Jones & Laughlin obtained the aluminum alloy from its suppliers in oval shapes into which the alloy had been formed by the aluminum producer through a process called extrusion.[2] The aluminum alloy is put in stock at Jones & Laughlin's factory in Muncie, Indiana. As orders come in for Jal Klamp fittings, the proper size of oval is taken out by one of the employees to correspond with the size of wire rope to be used. The wire rope is wrapped around an eye or thimble, and inserted with the oval properly placed into a hydraulic press. Under tremendous pressure, three hundred to five hundred tons, the aluminum alloy is cold-formed into and through the strands of the wire rope so that the aluminum alloy which was in the shape of an oval becomes in the shape of a cylinder, approximately four inches long, completely enclosing the loose end of the rope and forming a mechanical splice to complete the loop. Both ends of the rope or of the pendant line are then subjected to a proof test of approximately double the load for which the pendant line is intended. After the proof test the pendant line and affixed Jal Klamp are again visibly inspected.

From the time Matherne's employer purchased the crane in December 1958 and from the time of its purchase of the ten foot pendant line in May of 1959 to the time of the tragic accident, only one person had been permitted to operate the crane, one Bryant Smith. Mr. Smith testified that in the cab of the crane there appeared a schedule of limiting capacities of rated loads with which the crane can be safely operated, and that he had never exceeded the rated loads shown on that chart.

Those capacities are determined at eighty-five per cent of tipping load.[3] The safety factor in the Jones & Laughlin pendant lines and affixed Jal Klamp is 5 to 1; that is, the line should not break under tension less than five times the rated load.

Both the district court and this Court must consider the evidence in its strongest light in favor of the party against whom a motion for directed verdict or for judgment n. o. v. is made, and must give that party the advantage of every fair and reasonable

---

2. Professor George M. Sinclair of the University of Illinois testified for the plaintiffs as an expert in the field of metallurgy, and explained extrusion as follows: "I might say as a little demonstration or idea of what extrusion is—it amounts to squeezing materials out through a dye (sic). In other words, you have a cylinder and a plunger or piston rams it and what is done is that the aluminum or some material that you wish to extrude, is put into the cylinder, the ram is then forced forward and the material is forced through the dye, giving you a cross-sectional shape, which may be a star, a cross or round bar, or it can be a tube that comes out in the form, then, that you wish, in a long rod."

3. Tipping load is that load which puts the crane on the verge of tipping.

inference which the evidence justifies.[4] It is enough to say that, after a careful reading and consideration of the evidence, we conclude that no useful purpose will be served by an elaborate discussion of the evidence. The jury could reasonably believe from the evidence that the fractures in the Jal Klamp were ductile fractures rather than fatigue fractures which might have arisen from subsequent use, that the pendant lines had not been overloaded or misused after they left the factory, that the cracks were along the weak direction of the metal which might be expected from the original extrusion operation, that the cracks probably started at the time of the proof load or test at Jones & Laughlin's factory, and that the subsequent visual test was not sufficient to disclose the cracks. In brief, the jury could reasonably find that Jones & Laughlin negligently allowed the Jal Klamp to go to the distributor in a dangerously defective condition.

### 2. Contributory Negligence.

 The defense of contributory negligence pleaded before Matherne's death was simply: "And now, alternatively, defendants plead contributory negligence on the part of the plaintiff in bar to recovery herein." The issue as framed in the pretrial order was equally broad. The burden of proof is controlled by state law.[5] Under Louisiana law the burden of proving contributory negligence of the plaintiff rests upon the defendant[6]

Two of Matherne's fellow employees testified that in safety meetings conducted by their union the employees were warned not to go under the boom when the crane is operating, that Matherne attended the safety meetings and knew that safety rule.

Shortly before the accident occurred, the crane operator, Smith, had picked up the first bucket of concrete, about three-fourths of a yard of concrete. Smith graphically described the accident as follows:

"Q. And after you picked up the first bucket, what did you do with the crane, what operation did you go through?

"A. Picked the bucket up, I swang my boom around, and I boomed it down. I got my bucket over where I was going to pour and I poured. I lowered my concrete bucket within about a foot of the reinforcing steel, put my swing brake on, locked my brake on my bucket, and killed the motor.

"Q. The motor was off?

"A. Yes, sir.

"Q. And at that time or immediately prior thereto, had you seen Eustace Matherne?

"A. I had glimpsed him. Now, seeing him—I I was looking out of the machine and like I see, glimpse some of you all out there, I really don't know what he was doing, but I saw him that way.

"Q. Do you know whether or not he was doing any work or whether or not he had any business or work that would put him in that vicinity?

"A. There was a plumber to my left that—I think maybe he might have gone to talk to him or say something to him. As far as knowing what he was going to do, I don't.

"Q. Well, describe exactly what happened next?

"A. Well, the boom just suddenly fell and I seen Mr. Matherne

---

4. 5 Moore Federal Practice, 2d ed. ¶ 50.-02, p. 2316; 2B Barron & Holtzoff Federal Practice & Procedure, § 1075, p. 378.

5. Connecticut General Life Ins. Co. v. Breslin, 5 Cir. 1964, 332 F.2d 928, 933.

6. McCandless v. Southern Bell T. & T. Co., 1960, 239 La. 983, 120 So.2d 501; D. & D. Planting Co. v. Employers Casualty Co., 1960, 240 La. 684, 124 So.2d 908.

go down. When I rushed out there to see him I saw he was hurt and I run to the office and 'phoned.

"Q. Do you know whether or not Mr. Matherne was wearing a hat?

"A. He was wearing a hard cap. It is not what you call a hard hat, a hard hat has a brin all the way around, a hard cap just has a slight rolled edge.

"Q. Could you tell from the cab where he had been struck?

"A. It looked like, from looking at the cap, that he had been struck along in there (indicating). He had a crease in the hard cap."

Another employee, a plumber, testified that shortly before the accident Matherne had walked over and discussed part of the work with him. Leaving this employee, Matherne had walked about ten feet when the boom fell and struck him. The part of the boom which struck Matherne was *midway* between the cab of the crane and the loaded bucket of concrete. As has been seen, the jury in its special verdict answered in part as follows:

"5. Was Eustace Matherne Negligent? Yes

"6. If *your answer to No. 5 is in the affirmative, was his negligence a proximate cause of the accident?* No"

Jones & Laughlin urges that "under the evidence in the case at bar once the jury concluded that Eustace Matherne was negligent, *such negligence as a matter of law was a proximate cause of his injury.*"

■ It must be noted that under Rule 49(b), Fed.R.Civ.P., where a general verdict is accompanied by answers to interrogatories, the effect of inconsistency in the answers is treated, but that there is no such provision in Rule 49(a) where no general verdict is returned, as in the present case. Judge Wyzanski has commented:

"Nor can it accurately be said that the two parts of the verdict are condemned by the provisions of Rule 49(b) regarding inconsistent verdicts. Those provisions operate only when the jury is required to give a general verdict as well as to give answers to interrogatories. Where the jury is required to give only answers to interrogatories, inconsistencies in answers or in the reasoning necessarily underlying them do not always require a court to set aside a verdict."

Momand v. Universal Film Exchange, D.C.Mass.1947, 72 F.Supp. 469, 485, affirmed without discussion of this question, 172 F.2d 37 (1 Cir. 1948).

In any event the Supreme Court has held that the Seventh Amendment requires this Court to search for a view of the case that makes the jury's answers to special interrogatories consistent. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Limited, 1962, 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798. In the present case the jury could have found that Matherne's negligence preceded the completed fracture or cracking of the Jal Klamp and furnished only the condition upon which the defendant's negligence operated,[7] or it could have determined that Matherne was negligent when the crane was in operation, and that the boom fell later after the crane's operation had ceased, or it could have found that Matherne was contributorily negligent with respect to some risk other than the breaking of this Jal Klamp.[8] There are doubtless other views under which the answers would be consistent.

■ Whether Matherne was negligent and whether his negligence was a proximate cause of the accident were

---

7. Compare Norfolk & Dedham Mut. Fire Ins. Co. v. Liberty Mutual Ins. Co., La. App. 1960, 125 So.2d 175.

8. See Prosser on Torts, p. 286.

both questions for the jury. The answers to those two questions are not necessarily inconsistent.

### 3. Admissibility of Evidence.

■ The appellants argue that the district court erred by admitting evidence of prior failures of Jal Klamps without a showing of substantial similarity of conditions and reasonable proximity of time. Whether a reasonable inference may be drawn as to the harmful tendency or capacity of Jal Klamps from prior failures depends upon whether the conditions operating to produce the prior failures were substantially similar to the occurrence in question.[9] The requirement that the prior accident not have occurred at too remote a time is a special qualification of the rule requiring similarity of conditions.[10] The admission of such evidence is also subject to the reasonable discretion of the trial court as to whether the defendant is taken by unfair surprise and as to whether the prejudice or confusion of issues which may probably result from such admission is disproportionate to the value of such evidence.[11]

Evidence of prior failures of Jal Klamps was admitted in the direct examination of Bill Hodges and in the cross-examination of Grant Carpenter. The appellants do not claim unfair surprise for it had been required to answer an interrogatory inquiring as to prior failures within five years prior to the date of the accident and had reported six instances in which a Jal Klamp had cracked, failed or fractured while in service. This information formed the basis of plaintiffs' inquiries from the two witnesses, and Hodges was listed as a witness several weeks before the trial.

Mr. Hodges owned a truck, crane, and rigging company in Oklahoma City. In April 1959 he bought a forty-five ton crane equipped with pendant lines with Jal Klamps. He examined the pendant line and Jal Klamp involved in this case and testified that "the pendant lines were made alike, just like these here. Only mine was larger. This is seven-eighth line and my line was inch and one-eighth." Mr. Hodges testified that the Jal Klamp fittings had been later identified by a representative from Jones & Laughlin as parts from that company. Over the objection of Jones & Laughlin, Mr. Hodges was permitted to testify that in August of 1960, the month preceding the accident here involved, his crane tied on to a concrete slab, picked it up about a foot and the pendant line broke. Upon examination he found one Jal Klamp split about three-quarters of the way down, and six or seven small cracks in the other Jal Klamps. After the Jones & Laughlin representative called upon him, he was issued a credit for some $922 for the defective Jal Klamps. Jones & Laughlin's counsel declined to cross-examine the witness.

It is true that some of the conditions are dissimilar. Hodges' crane was the larger of the two. The weight of the concrete slab was not proved, nor was the prior use or condition of Hodges' pendant lines and Jal Klamps proved, nor whether the boom was in motion or resting. Jones & Laughlin had ample opportunity to explore these differences upon cross-examination or by its own witnesses who had investigated the accident, but it chose not to do so.

■ The Hodges Jal Klamps and pendant lines were similar to those here involved, and they were in use on a crane serving a similar purpose. The Jones & Laughlin catalog advertised the Jal Klamp as designed to have "tremendous strength" and to be "as strong as the rope itself." The safety of the system of manufacturing, testing and inspecting Jal Klamps was the dominant issue in this case. We cannot say that the district court erred in holding that there was sufficient substantial similarity to render the testimony admissible. The differences between the circumstances of

---

9. 2 Wigmore, Evidence § 458, pp. 472, 473; Annotation 70 A.L.R.2d 198, et seq.; Annotation 128 A.L.R. 595.

10. See 70 A.L.R.2d 198, n. 13, 208, 209.

11. See Annotation 128 A.L.R. 600.

the two accidents could have been developed to go to the weight to be given such evidence. It cannot be held inadmissible under either the federal or the state rule.[12]

■ Grant Carpenter's testimony as to prior failures came on cross-examination, and its admissibility depends on somewhat different principles. He was manager of operations for the division of Jones & Laughlin which fabricated wire rope assemblies. In his direct examination he had exhibited a motion picture of the methods of manufacture, inspection, and testing. His testimony went far to establish the proposition that all necessary prudence and safety precautions were employed in the manufacture, inspection and testing of Jal Klamps. On cross-examination he admitted that some of the Jal Klamps cracked or failed at the factory when subjected to the proof test, and that the inspection following the test was important. It was permissible on cross-examination to call attention to his knowledge of complaints of failures of Jal Klamps while in use. The breadth and scope of his cross-examination should be left to the discretion of the trial court.[13]

■ The appellants insist that a hypothetical question to one of plaintiffs' expert witnesses, Professor Gaylord, assumed that the pendant line and Jal Klamp had received normal use while in the custody of Matherne's employer, and that the factor of safety of the pendant line had not been exceeded, and that there was no evidence of these assumed facts. Smith, the crane operator, had exclusive control of its operation throughout the period. He testified that he had always used the crane in a safe and proper manner and had never picked up a load so heavy as to cause the crane to tip or "teeter-totter." The jury could have believed from the evidence all of the facts assumed in the hypothetical question.

#### 4. Charge to the Jury.

The court instructed the jury fully and clearly in a charge which is copied in some thirty-two pages of the record. In the course of that charge, the court emphasized the burden resting upon the plaintiffs to prove every essential element of their case by a preponderance of the evidence. The court also charged the jury as to the burden of proceeding, or of producing evidence as the case progressed, including the following:

"If, from the evidence, you determine that the Jal Klamp involved in this suit failed while being used in the manner for which it was intended, and that its failure was not caused by improper use of the equipment, either at the time of the accident or preceding the accident, nor at any other period of time, then the burden shifts to the defendant manufacturer, Jones & Laughlin, to show that they used ordinary care, under the circumstances, in the design, manufacture and inspection of the equipment. They do not have to explain or show what caused the failure, they merely have the burden of showing that they used reasonable care in their manufacturing process to produce a product reasonably fit for the purposes intended. If such reasonable care is shown to have been exercised by the manufacturer, then the burden again falls upon the plaintiff to prove by a preponderance of the evidence that the manufacturer was, in fact, guilty of some negligence and that such negligence was a proximate cause of the accident."

There was and is no objection to the quoted instructions. After the jury had deliberated for nearly two hours, it sent a note to the judge asking to be again charged on negligence. The court then fully instructed the jury a second time

12. Rule 43(a), Fed.R.Civ.P.; Lever Bros. Co. v. Atlas Assurance Co., 7 Cir. 1942, 131 F.2d 770, 777; Auzene v. Gulf Public Service Co., La.App.1939, 188 So. 512, 515.

13. 3 Wigmore, Evidence § 944, p. 495.

as to negligence, in a charge covering more than nine pages of the record. When the court called for any objections, the following occurred:

"MR. SCHUMACHER (Counsel for Jones & Laughlin):

"Your Honor, I do take exception to the additional charge on the following two grounds:

"Number one: Most importantly, I fear is that the additional charge had the general import of reversing burden of proof.

"THE COURT:

"Well, it is the identical charge. Let the objection be noted for the record, but it was the identical charge word for word with the charge originally given.

"Any other objections?

"MR. SCHUMACHER:

"Judge, I think there was an ad-libbed portion towards the end.

"THE COURT:

"I think that was to show freedom from fault rather than the converse. But in any events, are there any other objections to the charge?"

On appeal it develops that the part of the charge to which the defendant objected was an addition to the original charge in which the court instructed the jury:

"All of the evidence introduced as to the manufacturing processes in the past, together with all of the other evidence of use of the material and the happening of accidents in light of the evidence that you have had, must all be considered as elements to be taken into consideration, in determining whether or not, first, the manufacturer, Jones and Laughlin has shown to your satisfaction that they did use ordinary care in the design, manufacture, inspection and production, and did, in fact, put out a product which was reasonably suited for the purpose for which it was intended.

"If they have shown that to your satisfaction, then, you must look to the plaintiffs' proof to decide whether or not plaintiffs have then carried the burden of showing that in some respect or other, the manufacturer was guilty of negligence which proximately caused this accident."

Of course, there was no burden on the manufacturer to produce any evidence until after the plaintiffs had proved, as originally charged and repeated in the additional charge, "that the Jal Klamp involved in this suit failed while being used in the manner for which it was intended, and that its failure was not caused by improper use of the equipment, either at the time of the accident or preceding the accident, nor at any other period of time, then the burden shifts to the defendant manufacturer." Doubtless the court would have corrected the charge if, in objecting, counsel had stated *"distinctly the matter to which he objects and the grounds of his objection."* Rule 51, Fed.R.Civ.P. As said by the Supreme Court: "Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial." Palmer v. Hoffman, 1943, 318 U.S. 109, 119, 63 S.Ct. 477, 483.

■ Moreover, the court specifically cautioned the jury "to consider all of these charges as a whole." In view of the full and repeated correct charges, we are satisfied that the defendant was not injured by the apparently inadvertent omission from the part of the charge to which complaint is now directed.

We find no reversible error in the record, and the judgment is therefore

Affirmed.